UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

UN 2 9 2001

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

HINKLE ENGINEERING, INC.,

    Plaintiff,

v.

175 JACKSON L.L.C., INTELL
MANAGEMENT AND INVESTMENT
COMPANY, and WALSH CONSTRUCTION
COMPANY OF ILLINOIS,

    Defendants.

No.

**DOCKETED**

JUN 29 2001

**01 C 5078**

**JUDGE KOCORAS**

**MAGISTRATE JUDGE BOBRICK**

## COMPLAINT

Plaintiff Hinkle Engineering, Inc. complains of Defendants 175 Jackson L.L.C., Intell Management and Investment Company, and Walsh Construction Company of Illinois as follows:

### Parties

1.    Plaintiff Hinkle Engineering, Inc. ("Hinkle") is an Oklahoma business corporation with its principal place of business in Oklahoma City, Oklahoma.

2.    Defendant 175 Jackson L.L.C. ("Jackson") is an Illinois limited liability company with its principal place of business in Chicago, Illinois.

3.    Defendant Intell Management and Investment Company ("Intell") is a Delaware corporation with its principal place of business in Louisville, Kentucky.

4.    Defendant Walsh Construction Company of Illinois ("Walsh") is an Illinois corporation with its principal place of business in Chicago, Illinois.

## Jurisdiction and Venue

5.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between Hinkle, on the one hand, and Jackson, Intell, and Walsh (collectively, "the Defendants"), on the other hand, and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs.

6.     Jackson is subject to the exercise of personal jurisdiction – both general and specific – in this district.

7.     Intell is subject to the exercise of personal jurisdiction – both general and specific – in this district.

8.     Walsh is subject to the exercise of personal jurisdiction – both general and specific – in this district.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) & (2) because all of the Defendants reside in this district, and because a substantial part of the events and omissions giving rise to Hinkle's claims occurred in this district.

## Count I  (Breach of Contract Against Jackson)

10.     Hinkle realleges Paragraphs 1 through 9.

11.     Hinkle's Chicago office provides a wide range of mechanical and electrical engineering services to clients throughout the Midwest region.

12.     On or about February 1, 1998, Hinkle entered into a written lease ("the Lease") with Chicago Exchange Building Associates ("CEBA"), through its agent Helmsley-Spear of Illinois, Inc.

13.     A genuine copy of the Lease is attached to this Complaint as Exhibit A.

14.     CEBA was an Illinois partnership that Jackson acquired around July 1998.

15.     Jackson succeeded to CEBA as a party to the Lease and assumed all of CEBA's rights and duties under the Lease.

16.     The subject of the Lease was commercial office space in Suite 2109 ("the Offices") of the Insurance Exchange Building, 175 West Jackson Blvd., Chicago, Illinois ("the Building").

17.     The original term of the Lease was from February 1, 1998 to January 31, 2000. Hinkle and Jackson, through its managing agent Intell, later agreed to extend the term of the Lease, on a month-to-month basis, through May 31, 2000.

18.     Pursuant to Paragraph 20 of the Lease, Jackson had the contractual duty to ensure that Hinkle peacefully and quietly had and enjoyed the possession of the Offices.

19.     In early 2000, there were major construction projects taking place at the Building. These projects involved construction work being done on the Building's roof, as well as heavy construction materials being placed on the roof.

20.     This construction activity resulted in significant damage to the roof. The negligence of the parties performing and supervising the construction activity created large holes in, and damage to, the roof.

21.     This extensive roof damage to the Building allowed rain water to enter the Building, which in turn caused severe and periodic flooding in the Offices from about February through May 2000.

22.     The flooding in the Offices caused substantial damage to Hinkle's property and severely disrupted and harmed Hinkle's business activities. This damage and harm included, but was not limited to, damaged office equipment and supplies; the loss of a proper working

3

environment; lost productivity for Hinkle's engineering professionals and office staff; additional hours of overtime work; rental payments that Hinkle should not have been obligated to make; harm to existing business relationships; and lost business opportunities.

23.    From about February through May 2000, Hinkle repeatedly informed Jackson, through its managing agent Intell, of the flooding problems.

24.    Despite these notices, Jackson refused to correct the problems that were causing the repeated flooding in the Offices.

25.    Furthermore, Jackson refused to compensate Hinkle for the damage and harm that Hinkle suffered.

26.    By failing to properly supervise the construction work done at Jackson's request, by allowing the negligent construction work to cause severe flooding and related disruption in the Offices, by failing to correct these problems despite receiving notices from Hinkle, and by interfering with Hinkle's peaceful and quiet possession and enjoyment of the Offices, Jackson breached the Lease and thereby damaged Hinkle in an amount that exceeds $75,000, exclusive of interest and costs.

27.    Until Jackson breached the Lease, Hinkle had performed all of its obligations under the Lease.

WHEREFORE, Hinkle respectfully asks that this Court enter judgment in its favor and against Jackson on Count I in an amount in excess of $75,000 to be determined at trial, plus interest, costs of suit, and any other further relief that this Court deems just.


## Count II  (Negligence Against All Defendants)

28.    Hinkle realleges Paragraphs 1 through 25.

29.    Walsh was the general contractor for the above-described construction work taking place at the Building.

30.    Walsh therefore had a duty to supervise the construction work taking place at the Building and to ensure that the construction work was done in a manner that was free from negligence, that would not interfere with Hinkle's ongoing use of the Offices, and that would not damage the property and business of the Building's tenants such as Hinkle.

31.    By allowing the construction work to be done in a negligent manner, and by failing to repair the roof damage that caused the flooding and the resulting harm to Hinkle, Walsh breached its duty of care to Hinkle.

32.    From about February through May 2000, Intell was responsible for the management of the Building.  Intell therefore had a duty to ensure that tenants in the Building such as Hinkle could peacefully use and enjoy their leased space while the construction was occurring.  Intell also had a duty to ensure that the construction companies did not perform their work negligently and thereby harm tenants such as Hinkle.

33.    By failing to prevent or correct the flooding problems, despite being aware of these problems and the negligent construction work, Intell breached its duty of care to Hinkle.

34.    Jackson, as Hinkle's landlord, had a duty to ensure that the construction work was not performed negligently; that the construction work did not harm the property or business of tenants such as Hinkle; and the construction work did not interfere with Hinkle's use and enjoyment of the leased premises.

35.    By failing to prevent or correct the flooding problems, despite being aware of these problems and the negligent construction work, Jackson breached its duty of care to Hinkle.

36.     The negligent acts and/or omissions of the Defendants proximately caused Hinkle to be damaged, as described above, in an amount that exceeds $75,000, exclusive of interest and costs.

37.     The Defendants' conduct, as described above, was grossly negligent and was willful and wanton.  Hinkle therefore is entitled to recover punitive damages from the Defendants.

WHEREFORE, Hinkle respectfully asks that this Court enter judgment in its favor and against all of the Defendants, jointly and severally, on Count II in an amount in excess of $75,000 to be determined at trial (but not to duplicate any amounts recovered through Count I), including both compensatory and punitive damages, plus interest, costs of suit, and any other further relief that this Court deems just.


*HINKLE DEMANDS A TRIAL BY JURY ON ALL CLAIMS AGAINST ALL DEFENDANTS.*


HINKLE ENGINEERING, INC.

By _____
Its Attorney

Jay R. Hoffman  (No. 6193213)
Suite 802
19 South LaSalle Street
Chicago, IL 60603
(312) 899-0899

Lease #4188
Hinkle Engineering
Suite 2109
2/1/98-1/31/00

# LEASE

For Space In

## INSURANCE EXCHANGE BUILDING
### Located at 175 W. Jackson Boulevard
### Chicago, Illinois 60604


EXHIBIT
A

THIS INDENTURE, made this 12th day of January, 1998 between **CHICAGO EXCHANGE BUILDING ASSOCIATES,** a partnership, hereinafter referred to as "Landlord", and

Hinkle Engineering

hereinafter referred to as "Tenant."

The following Schedule sets forth basic information and definitions concerning this Lease, and is hereby made a part hereof:

### Schedule

Building: Insurance Exchange Building, 175 West Jackson Blvd., Chicago, Illinois 60604

Description of Premises _____ suite 2109

Tenant's use of Premises _____ engineering/general office

Base Annual Rent $_____30,240.00_____

Initial Monthly Installments of Base Annual Rent $_____2,520.00_____

Tenant's Proportion for purposes of Rent Adjustment _____.16 %

Term of Lease in _____2_____ years ____0____ months

Tenant's Address for notice before possession date_____suite 964-966

Percentage of Increase of Consumer Price Index _____35 %

Commencement date _____February 1, 1998_____

Termination date _____January 31, 2000_____

Base Year for rent adjustment _____12/97_____

First Adjustment Year for rent adjustment _____2/1/99_____

Security Deposit $_____2,520.00_____

Air conditioning charge is _____n/a__ per month

Riders and Amendments_____see attached

Workletter_____see attached

### WITNESSETH:

**LEASING AGREEMENT**

1. Landlord hereby demises and leases to Tenant and Tenant hereby accepts and leases the Premises in the Building for the term, all as set forth in the Schedule, unless sooner terminated as provided herein, to be occupied and used by Tenant solely for the purpose as set forth in the Schedule, and for no other use or purpose whatsoever without Landlord's prior written consent, upon the terms and conditions hereinafter set forth, all and every one of which the Tenant covenants and agrees to keep and observe.

**BASE ANNUAL RENT**

2. Tenant shall pay to Landlord's agent at the office of the Building, or to such other person or at such other place as directed from time to time by notice to Tenant from Landlord, without any abatement, deduction, setoff or deferment for any reason, the Base Annual Rent in equal monthly installments all as set forth in the Schedule, plus the amount of any adjustment of the Base Annual Rent as provided in Paragraph 3. Each monthly installment will be payable in advance promptly on the first day of each calendar month during the term of this lease in lawful money of the United States of America. If the rent should commence or terminate on a day other than the first day of the month, then the rent for such month shall be prorated for such fractional month. Such Base Annual Rent, plus any adjustments thereof as provided in Paragraph 3, and any other sums due and payable by Tenant under this Lease, are hereinafter collectively referred to as "Total Rent."

**RENT ADJUSTMENTS**

3. The Base Annual Rent payable hereunder shall be adjusted to reflect changes in the Consumer Price Index, Operating Expenses and in Taxes, as hereinafter defined, in the following manner:

(a) **Definitions.**

For the purposes of the adjustment, the following definitions shall apply:

A. **"Base Annual Rent"** shall mean the Base Annual Rent as set forth in the Schedule.

B. **"Base Year"** shall mean the full calendar year set forth in the Schedule.

C. **"Building"** shall mean both buildings, formerly known as the Insurance Exchange Building, North, and the Insurance Exchange Building, South, as described in the Schedule.

D. **"Adjustment Year"** shall mean any calendar year or portion thereof during the term of this Lease commencing with the year set forth in the Schedule. In the event that the first Adjustment Year or the last Adjustment Year is not a full calendar year under the term of this Lease, then the Total Rent payable under this Lease with respect to such partial year shall be prorated for the number of days in the term included within such partial year.

E. **"Operating Expenses"** shall mean all of the costs of operation, maintenance and administration of the Building of every kind and nature, as determined by standard accounting practices and shall include, by way of illustration and not limitation, costs of wages and salaries of all employees engaged in operating and maintenance or security of the Building, including taxes, insurance, and benefits relating thereto, heat, electricity, all other utilities, water, contracted labor, insurance premiums, materials and supplies, service fees or charges, licenses, permits and inspection fees, and fees and costs incurred in connection with any efforts to obtain reductions of real estate taxes. It shall not include Taxes as defined hereafter. If, by reason of a major capital improvement or by use of automation the Operating Expenses in any year after the Base Year are reduced, then the Operating Expenses for the Base Year shall be reduced for the purposes of determining rent adjustments in an amount determined by the Building's accountants as though such improvement or automation had been in effect during the Base Year. In the event part of the Building is unoccupied during the Base Year or any Adjustment Year, the Operating Expenses shall be adjusted so as to reflect the Operating Expenses of the Building as though fully occupied. Repairs or expenses scheduled less often than annually may, at Landlord's election, be prorated over the period to which such expenditures are applicable in which event such proration shall be applicable as relevant to the Base Year or any Adjustment Year.

F. **"Taxes"** shall mean all real estate taxes levied against the Building and land thereunder and ad valorem taxes for Landlord's personal property used in connection therewith, payable in the lease term, and all taxes and assessments, special or otherwise, installments of which are required to be paid during such Adjustment Year, and all other governmental charges of any kind or nature whatsoever. If hereafter there shall be assessed any tax or assessment payable by Landlord to the State of Illinois, City of Chicago, or any other political subdivision or governmental authority either on the rents or other income collected from the Building or the land on which it is located (not including a general income or franchise tax) or in the event that any other tax or assessment may be imposed hereafter in lieu of or partially in lieu of such ad valorem real estate taxes or personal property taxes, then such taxes shall be included with the term "Taxes" under the provisions of this Lease. Taxes shall be as initially billed and payable in the Base Year and Adjustment Year, respectively, even though such tax represents Taxes levied for a prior year, and without regard to whether or not this Lease was in existence during such period.

G. **"Consumer Price Index"** shall mean the Consumer Price Index for All Urban Consumers —Chicago Area, 1967 equals 100, as issued by the United States Department of Labor. If the manner in which the Consumer Price Index is determined by the Department of Labor shall be substantially revised, an adjustment shall be made in such revised index which would produce results equivalent, as nearly as possible, to those which would have been obtained if the Consumer Price Index had not been so revised. If the 1967 average shall no longer be used as an index of 100, such change shall constitute a substantial revision. If the Consumer Price Index shall become unavailable to the public because publication is discontinued, or otherwise, Landlord will substitute therefor a comparable index based upon changes in the cost of living or purchasing power of the consumer dollar published by any other governmental agency or, if no such index shall then be available, a comparable index published by a major bank or other financial institution or by a university or a recognized financial publication.

H. **"Base Year Consumer Price Index"** shall mean the Consumer Price Index for the month of December of the Base Year.

**(b) Adjustment for Operating Expenses.**

In the event that the Operating Expenses for the calendar year immediately prior to any Adjustment Year are greater than the Operating Expenses for the Base Year, then the monthly installments of Base Annual Rent for such Adjustment Year shall be increased by one-twelfth (1/12th) of the Tenant's Proportion of such increase as set forth in the Schedule.

2

**(c) Adjustment for Taxes.**

In the event that the Taxes for any calendar year immediately prior to any Adjustment Year are greater than the Taxes payable during the Base Year, then the monthly installments of Base Annual Rent for such Adjustment Year shall be increased by one-twelfth (1/12th) of the Tenant's Proportion of such increase as set forth in the Schedule.

**(d) Consumer Price Index Adjustment.**

The Base Annual Rent payable under this Lease shall be increased in each Adjustment Year to reflect a percentage (set forth in the Schedule) of the increase, if any, of the Consumer Price Index for the month of December preceding each Adjustment Year over the Base Year Consumer Price Index. Such increase shall be computed by the following formula:

$$B \times \frac{(CPIA\text{-}CPIB)}{CPIB} \times P$$

For purposes of the foregoing formula:

B is the Base Annual Rent, as set forth in the Schedule.

CPIB is the Base Year Consumer Price Index.

CPIA is the Consumer Price Index for the month of December preceding each Adjustment Year.

P is the Percentage of Increase of Consumer Price Index, as set forth in the Schedule.

**(e) Billing and Payment.**

Landlord will keep, or cause to be kept, books and records showing the Operating Expenses and Taxes of the Building for the Base Year and each Adjustment Year in accordance with the system of accounts and accounting practices followed for similar office buildings in Chicago.

As soon as data is available after January 1 of each Adjustment Year, Landlord shall submit to Tenant a statement showing the computation of the adjustments to Total Rent, if any, due pursuant to the foregoing provisions for adjustment. Within thirty (30) days after the date of such statement, Tenant shall pay any amounts due for the period from January 1 of the current Adjustment Year to the date of such statement, and shall thereafter pay Total Rent as adjusted on a monthly basis.

At any time during the term of this Lease, Landlord shall have the option to elect, by written notice to Tenant, to have the adjustments of Total Rent paid to Landlord in an alternative manner, to wit: Prior to January 1 of an Adjustment Year, Landlord shall submit to Tenant its estimate of any increases in the Operating Expenses, Taxes, and Consumer Price Index for the calendar year preceding such adjustment year, and Tenant shall immediately commence payment of Total Rent on a monthly basis as computed according to such estimate, effective as of January 1. As soon as actual data concerning the Operating Expenses, Taxes and Consumer Price Index for the preceding calendar year become available, Landlord shall submit to Tenant its statement of actual Total Rent payable during the Adjustment Year. In the event Landlord's estimate of Total Rent was in excess of the actual Total Rent payable during the Adjustment Year, Landlord shall permit Tenant to set off the amount of any excess monthly payments of Total Rent against subsequent monthly payments of actual Total Rent, and Tenant shall thereafter pay the actual amount of Total Rent on a monthly basis. In the event Landlord's estimate of Total Rent was less than the actual Total Rent payable during the Adjustment Year, Tenant shall, within thirty (30) days of receipt of Landlord's statement, tender the amount of such deficiency for the preceding months of the Adjustment Year, and shall thereafter pay the actual amount of Total Rent on a monthly basis.

(f) Unless Tenant objects in writing within fifteen (15) days to Landlord's statement of adjusted Total Rent, regardless of the manner in which it is billed, Tenant shall be deemed to have accepted such statements and shall thereafter be estopped from challenging same.

(g) In no event shall the adjustments herein, either for Consumer Price Index, Operating Expenses or Taxes, result in a decrease in the Base Annual Rent.

**SERVICE**

4. (a) The Landlord shall provide the following services without cost to the Tenant except as otherwise provided for electricity and air conditioning:

A. Janitor Service and customary cleaning in and about the Premises, Saturdays, Sundays and Holidays excepted. Tenant shall not provide any janitor service without Landlord's prior written consent, and, if consent be given, always subject to the supervision of Landlord and at Tenant's sole responsibility and by janitor contractor or employees at all times satisfactory to Landlord.

3

B. Heat daily from 8 a.m. to 6 p.m. (Saturday to 1 p.m.), Sundays and Holidays excepted, whenever heat shall be required in Landlord's judgment for the comfortable occupancy of the Premises, subject to government regulation.

C. Water from City mains for drinking, lavatory and toilet purposes as customary for office use, drawn through fixtures installed by Landlord, or by Tenant with Landlord's consent. Tenant shall pay, at rates fixed by Landlord, for water used for any other purpose.

D. Passenger Elevator Service in common with other tenants daily from 8 a.m. to 6 p.m. (Saturdays to 1 p.m.), Sundays and Holidays excepted. Freight elevator service will be furnished at such times and for such charges as shall be applicable from time to time during the term by Landlord's established policy for the Building. Elevator service may be provided by automatic passenger-controlled elevators.

E. Electricity so long as Landlord shall distribute current for light and power in the Building. So long as Landlord provides it Tenant shall obtain all current from Landlord and pay such charges as Landlord may lawfully levy therefor, as measured by meter, plus maximum demand charge or readiness to serve charge. Tenant's failure to pay promptly Landlord's lawful charges for electricity shall be deemed an event of default hereunder, and in addition to any other remedy provided to Landlord hereunder or by law for such default, Landlord may, upon not less than ten (10) days written notice or such other notice as may be required by applicable law, discontinue such electrical service and no such discontinuance shall be deemed an eviction or disturbance of Tenant's quiet enjoyment of the Premises or render Landlord liable for damages or relieve Tenant from any obligation. Upon not less than thirty (30) days written notice, Landlord may cease to furnish electricity without responsibility to Tenant, except to connect, at Tenant's expense, the electric wiring system of the Premises to another source of supply. Electricity used during janitor service, alterations or repairs in the Premises shall also be paid for by Tenant.

F. Air Conditioning daily from 8 a.m. to 5 p.m., Saturdays, Sundays and Holidays excepted, whenever air conditioning shall be required in Landlord's judgment for the comfortable occupancy of the Premises, subject to government regulation. Tenant shall pay Landlord for such service, in addition to the Total Rent otherwise due under this Lease, a sum equal to the product of the air conditioning charge set forth in the Schedule multiplied by the number of days in which air conditioning service was provided. Such sum shall be set forth in a statement which Landlord shall provide to Tenant on a monthly basis following months in which air conditioning service is provided, and Tenant shall pay such sum within five (5) days of receipt of such statement.

(b) Landlord does not warrant that any of the services above mentioned will be free from interruptions or reductions caused by repairs, renewals, improvements, alterations, strikes, lockouts, accidents, inability of Landlord to obtain fuel or supplies, governmental regulations, or any other cause or causes beyond the control of Landlord. Any such interruption of service shall never be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof, or render Landlord liable to Tenant for damages, or relieve Tenant from performance of Tenant's obligation under this Lease.

**RECORDING**

5. Except for recording of a memorandum of this Lease which may be accomplished only if approved by Landlord, nothing contained shall empower Tenant to do any act which can, shall or may encumber the interest or title of Landlord or its assignee in and to the land or Building.

**SECURITY DEPOSIT**

6. As additional security for the full and prompt performance by Tenant of all of its obligations hereunder Tenant has upon execution of this Lease paid to Landlord the security deposit set forth in the Schedule which sum may be applied by Landlord for the purpose of curing any default or defaults of Tenant under this Lease. Said security deposit shall not bear interest. If Tenant has not defaulted hereunder then said security deposit or any portion thereof not retained or applied by Landlord to cure a default shall be paid in cash to Tenant promptly upon the termination of the Lease, provided that the actual adjustment of the Total Rent has been satisfied pursuant to Paragraph 3. In the event that Landlord expends monies from said Security Deposit as aforesaid, Landlord shall notify Tenant in writing of such expenditures, whereupon Tenant shall immediately pay to Landlord as supplemental security deposit, the amount so expended by Landlord.

**SUBORDINATION OF LEASE AND ESTOPPEL**

7. Tenant is informed and understands that Landlord is the lessee under a lease of the land and is the owner of the entire Building of which the Premises form a part. This Lease is and shall be subject and subordinate to all ground or underlying leases which now or may hereafter affect such land or Building and to all mortgages which may now or hereafter affect such leases and to all renewals, modifications, consolidations, replacements and extensions of such leases and mortgages. This section shall be self-

4

operative and no further instrument of subordination shall be necessary. In confirmation of such subordination Tenant shall execute promptly any instrument that Landlord may request. Tenant hereby appoints Landlord as Tenant's irrevocable attorney-in-fact to execute any document of subordination on behalf of Tenant. In the event that any such ground or underlying lease is terminated or any such mortgage is foreclosed, this Lease shall not terminate or be terminable by Tenant unless Tenant was specifically named in any termination or foreclosure judgment or final order. In the event that any such ground or underlying lease is terminated, Tenant agrees (a) to enter into a new lease covering the Premises for the remaining term of this Lease and otherwise on the same terms, conditions and rentals as herein provided with and at the election of the holder of any superior lease or if there is no superior lease in existence, then with and at the election of the holder of the fee title to the Building or (b) at the request of the aforesaid parties in the order stated, to attorn to them and to execute and deliver at any time and from time to time upon such request any instrument which in the sole judgment of the party making such request may be necessary or appropriate to evidence such attornment. From time to time Tenant on at least ten (10) days' prior written request by Landlord will deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect as modified (or if there shall have been modifications, that the same is in full force and effect as modified and stating the modifications) and the dates to which the rent and other charges have been paid and stating whether or not the Landlord is in default in performance of any covenant, agreement or condition contained in this Lease and if so specifying each such default of which Tenant may have knowledge.

**CERTAIN RIGHTS RESERVED TO THE LANDLORD**

8. The Landlord reserves the following rights exercisable without notice or liability to Tenant and without being guilty of an eviction or disturbance of Tenant's use or possession:

**A. Access to Mail Chute.** To have access for Landlord and other tenants of the Building to any mail chute located on the Premises according to the rules of the United States Post Office.

**B. Occupancy.** If during the term hereof Tenant vacates the Premises, to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy.

**C. Pass Keys.** To have pass keys to the Premises.

**D. Access for Repairs, etc.** To have reasonable access for inspection, repairs, alterations, additions and improvements to the Premises or to the Building, as further set forth in Paragraph 12.

**E. Show Premises.** To show the Premises to prospective tenants or brokers during the last year of the term of this Lease, and to prospective purchasers at all reasonable times provided prior notice is given to Tenant in each case and the Tenant's use and occupancy of the Premises shall not be materially inconvenienced by any such action of the Landlord.

**F. Service Contracts.** To designate all sources furnishing sign painting, ice, drinking water, beverages, foods, towels or toilet supplies used or consumed in the Building or on the Premises.

**G. Heavy Equipment.** To approve the weight, size and location of safes or heavy equipment or articles which articles may be moved, in, about, or out of the Building or Premises only at such times and in such manner as Landlord shall direct and in all events, however, at Tenant's sole risk and responsibility.

**H. Close Building.** To close the Building after regular working hours and on legal holidays subject, however, to Tenant's right to admittance, under such regulations as Landlord may prescribe from time to time, which may include, by way of example but not of limitation, that persons entering or leaving the Building identify themselves to a watchman by registration or otherwise and that said persons establish their right to enter or leave the Building.

**I. Change Name.** To change the name or street address and place and maintain signs on the exterior and in hallways, stairs, lobby and corridors of the Building.

**J. Exclusive Rights.** To grant to anyone the exclusive right to conduct any particular business in the Building, provided such exclusive right shall not operate to exclude Tenant from the use of the Premises hereby expressly permitted.

**K. Relocate Tenant.** To relocate, at Landlord's cost and expense, Tenant to other Premises in the Building of equivalent square footage as the Premises leased hereunder, upon ninety (90) days' notice to Tenant.

**LIABILITY CLAIMS AND INSURANCE**

9. (a) To the extent permitted by law, Landlord shall not be liable, and Tenant waives all claims it may have against Landlord, its agents or employees, for loss or damage to person or property sustained by Tenant or any occupant or other person resulting, directly or indirectly, from the Premises or any part of said Premises or any equipment or appurtenance of the Premises or the Building becoming out of repair, or

5

resulting from any accident within the Premises or the Building, or resulting directly or indirectly from any act or neglect of Tenant, Landlord or occupant of the Premises or any other person while on the Premises or in the Building. This subparagraph shall apply especially, but not exclusively, to damage caused by water, snow, frost, steam, excessive heat or cold, sewage, gas, odors, noise, the bursting or leaking of pipes or plumbing fixtures, and theft or misappropriation of Tenant's property, and shall apply whether damage results from the act or neglect of other tenants, occupants, or servants of the Building or other person.

(b) Tenant shall carry fire and extended coverage insurance insuring its interest in the tenant improvements in the Premises and its interest in its office furniture, equipment, and supplies, and Tenant shall and does hereby waive any rights of action against Landlord for loss or damage, and the policies shall permit such waiver.

(c) Tenant will secure and during the entire term hereof maintain general liability and property damage insurance, naming Landlord and Tenant as the insured parties, covering the Premises and adjacent ways, in amounts and in financially responsible companies reasonably acceptable to Landlord, but in no event less than $300,000.00 for death or injury to a single person, $1,000,000.00 for death or injury and damage arising out of a single accident or occurrence, and $250,000.00 for property damage. Certificates evidencing this insurance shall be furnished to Landlord.

(d) If any damage to the Building results from any act or neglect of Tenant, Landlord may at Landlord's option repair such damage, and Tenant shall thereupon pay to the Landlord the total cost of such repairs and damages to the Building, provided, however, that Landlord waives any right of action against Tenant for any loss or damage to the Building, including the Premises, resulting from fire or other casualty by such act or negligence of Tenant, if Landlord's insurance policy permits such a waiver, provided, however, that such waiver shall be effective only to the extent that Landlord recovers the amount of such loss or damage from its insurance carriers. If Tenant occupies space in which there is exterior plate glass, then Tenant shall be responsible for the damage, breakage or repair of such plate glass (unless caused by fire or other casualty covered by Landlord's fire and extended coverage insurance) and shall furnish to Landlord customary certificates indicating that policies of plate glass insurance have been purchased and paid for by Tenant.

**CONDITION OF PREMISES AND REPAIRS**

10. (a) Except as to any matters set forth in a Workletter as indicated in the Schedule and attached hereto and made a part hereof, it is agreed that Tenant has examined the Premises prior to the execution of this Lease and is satisfied with the physical condition thereof, agrees to accept the Premises in an "as is" condition, and further agrees that no representation has been made by Landlord or Landlord's agent as to the condition or repair of the Premises and there has been no agreement, other than as above set forth to redecorate, alter, repair or improve said Premises either before or after the execution of this Lease.

(b) During the term of this Lease, Tenant shall maintain Premises in as good condition as when the Tenant took possession, or as when completed after possession, loss or damage caused by ordinary wear and tear, and fire and other casualty insured against by Landlord excepted, failing which the Landlord may restore the Premises to such condition and the Tenant shall pay the cost thereof. At the termination of this Lease, Tenant shall return the Premises to Landlord in as good condition as just described, provided, however, that the Tenant may remove any trade fixtures and other like equipment installed by Tenant. Such removals shall be done in a good and workmanlike manner and all surfaces restored to the condition they were in at the commencement of this Lease. If the Tenant does not remove the Tenant's furniture, equipment, machinery, trade fixtures, and all other items of personal property of every kind and description from the Premises prior to the end of the term however ended, or any extension thereof, Landlord may elect to remove such items and Tenant shall promptly reimburse Landlord for any expense, including storage, related thereto. If Landlord does not so elect to store such property, the Tenant shall be conclusively presumed to have conveyed the same to the Landlord under this Lease as a bill of sale without payment or credit by the Landlord to the Tenant.

**ALERATIONS AND CONSTRUCTION**

11. (a) Tenant may not do any work in the Premises such as, but not limited to, painting, decorating, erecting partitions, making alterations or additions, installation of electrical equipment, nailing, boring or screwing into the ceilings, walls or floors, or any other repairs ("Work") without the prior written consent of Landlord in each and every instance. The decision of Landlord to refuse such consent shall be conclusive. In order to obtain such consent, Tenant shall furnish Landlord (i) plans and specifications for the Work, (ii) names and addresses of contractors ("Contractors") and subcontractors ("Subcontractors"), (iii) copies of contracts with Contractors and Subcontractors which shall provide, among other things, that no changes, amendments, extras or additional work are permitted without the consent of Landlord, and (iv) affidavits from engineers acceptable to Landlord stating that the Work will not in any way adversely affect any mechanical system in the Building, such as, but not limited to, the heating, ventilating, air conditioning or electrical systems.

6

(b) If Landlord grants such consent all Work shall be performed in a good and workmanlike manner (and materials furnished shall be of a like or superior quality to those in the Building) and either by or under the supervision of Landlord but at the sole expense of Tenant, employing union laborers who shall work in harmony with Building employees. Subsequent to the granting of such consent but before the commencement of the Work or delivery of any materials onto the Premises or into the Building, Tenant shall furnish Landlord (i) necessary permits required by governmental authorities with jurisdiction, (ii) sworn Contractor affidavits listing all subcontracts with suppliers of materials and/or labor, with whom Contractors have contractual relations for the Work, and setting forth a summary of such contractual relationships, (iii) Subcontractor affidavits, (iv) indemnification in the form of cash in a sum equal to the total value of the Work, (v) certificates of insurance from all Contractors and Subcontractors performing labor or furnishing materials, insuring against any and all claims, costs, damages, liabilities and expenses which may arise in connection with the Work, and (vi) such other documents as may be reasonably requested by Landlord.

(c) Upon completion of the Work, Tenant shall furnish Landlord with (i) Tenant, Contractors and architectural completion affidavits, (ii) full and final waivers of lien, (iii) receipted bills covering all labor and materials expended and used, (iv) other appropriate documents evidencing completion of the Work, including inspection approvals by appropriate government officials and (v) as-built plans of the Work. If all of the foregoing are acceptable to Landlord in its sole discretion, Landlord shall disburse the funds deposited pursuant to Paragraph 11(b)(iv) to the order of Tenant.

(d) Tenant shall pay Landlord for use of elevators and/or hoists, during the Work, at the same rate being charged to other similar users. Tenant shall cooperate with Landlord in scheduling such use.

(e) If the Work is being done at or prior to the commencement of the Lease term, Tenant agrees to commence payment of Total Rent upon the date and in the manner provided in this Lease notwithstanding any delay in completing the Work on the Premises.

(f) Tenant shall procure, or cause to be procured, and pay for all permits, licenses, approvals, certificates and authorizations necessary to the prosecution and completion of the Work. All Work shall be done in strict accordance with all laws, ordinances, rules, regulations and requirements of the Board of Underwriters and all Municipal, State, Federal and other authorities having jurisdiction. Where drawings and specifications conflict with the law, the law is to be followed. Tenant shall promptly notify the respective departments or official bodies when the Work is ready for inspection and shall, at once, do all work required to remove any violations or to comply with such inspections, without charge to Landlord. Tenant shall perform, or cause to be performed, all work necessary to obtain approvals from authorities mentioned above without additional cost to Landlord.

(g) Tenant agrees to pay Landlord a sum equal to the direct costs incurred as compensation for its inspection and supervision of the Work, plus all sums expended for examination and approval of the architectural and mechanical plans and specifications, plus ten percent (10%) thereof for Landlord's overhead. In the event Tenant elects to have any work performed by Landlord's employees or contractors, Tenant shall pay Landlord (i) all of the Landlord's costs and overhead according to the preceding sentence, plus (ii) the actual cost to Landlord of such work, plus (iii) ten percent of the sum of (i) and (ii) aforesaid.

(h) Tenant agrees that the Work shall be performed so as not to cause or create any jurisdictional or other labor disputes, and in the event such disputes occur, Tenant shall immediately do whatever is necessary to resolve such disputes, at no expense to Landlord.

(i) Tenant hereby agrees to hold Landlord, its partners and their respective agents and employees harmless from any and all liabilities of every kind and description, including reasonable attorney's fees which may arise out of or be connected in any way with the Work. Any mechanic's lien (or any notice preliminary to lien) filed against the Premises, the Building, or the land underlying the Premises, for the Work or materials claimed to have been furnished to Tenant shall be paid and discharged of record by Tenant within ten (10) days after filing (or service) at the expense of Tenant.

(j) All additions, decorations, fixtures, hardware, nontrade fixtures and all improvements, temporary or permanent, in or upon the Premises, whether placed there by Tenant or Landlord, shall, unless Landlord requests their removal, become the property of Landlord and shall remain upon the Premises at the termination of this Lease by lapse of time or otherwise without compensation, allowance or credit to Tenant, under this Lease as a bill of sale. If, upon the request of Landlord, Tenant does not remove said additions, decorations, fixtures, hardware, nontrade fixtures and improvements, Landlord may remove them and Tenant shall pay the cost of such removal, including storage, to Landlord upon demand.

7

**REPAIRS BY LANDLORD**

12. At all times, Landlord, either voluntarily or pursuant to governmental requirement, may at Landlord's own expense, make repairs, alterations or improvements in or to the Building or any part thereof, including the lobby, rotunda, the light court, and the Premises, and during operations, may close entrances, doors, corridors, elevators and other facilities and may have access to and open the ceilings, all without any liability to Tenant by reason of interference, inconvenience or annoyance. If such work should materially reduce the area rented by Tenant, the rent paid by Tenant shall be proportionately reduced.

**RULES AND REGULATIONS**

13. The Tenant shall abide by all rules and regulations adopted by Landlord pertaining to the operation and management of the Building. If any rules and regulations are contrary to the terms of this Lease, the terms of this Lease shall govern.

**UNTENANT-ABILITY**

14. (a) If all or any substantial part of the Premises, or so much of the Building as to make its operation undesirable in Landlord's sole opinion, are made untenantable by fire or other casualty, Landlord may elect:

A. to terminate this Lease as of the date of such fire or casualty by notice to Tenant within one hundred twenty (120) days of such date, or

B. to proceed with all due diligence to repair, restore or rehabilitate the Building or the Premises at Landlord's expense, except for property and improvements of Tenant, in which latter event this Lease shall not terminate, provided however, if Landlord fails substantially to repair, restore or rehabilitate the Premises within 180 days after the Landlord receives possession of the damaged Premises and undertakes reconstruction or repairs, then Tenant shall have the right to terminate this Lease as of the date of such fire or casualty by serving notice on Landlord within ten (10) days after the expiration of the said 180 day period.

(b) In the event this Lease is not terminated pursuant to this Paragraph, Total Rent shall abate on a per diem basis during the period of untenantability of the Premises. In the event of the termination of the Lease pursuant to this Paragraph, Total Rent shall be apportioned on a per diem basis and paid to the date of the fire or other casualty. If the Premises are damaged by fire or other casualty but all or a substantial part of the Premises are not made untenantable, then Landlord shall, except during the last year of the term hereof, proceed with all due diligence to repair and restore the Premises and the Total Rent shall abate in proportion to the non-usability of the Premises during the period of such partial untenantability. If the Premises are partially damaged as aforesaid during the last year of the term hereof, Landlord shall have the right to terminate this Lease as of the date of the fire or other casualty by giving written notice thereof to Tenant within thirty (30) days after the date of fire or other casualty, in which event the Total Rent shall be apportioned on a per diem basis and paid to the date of such fire or other casualty.

**HOLDING OVER**

15. If the Tenant retains possession of the Premises or any part thereof after the termination of the term of this Lease, by lapse of time or otherwise, Tenant shall as a charge for the use of the Premises, pay Landlord rent at double the rate of Total Rent payable for the year immediately preceding said holdover, computed on a monthly basis for the time Tenant thus remains in possession. Tenant shall also pay Landlord's actual damages. Any retention of the Premises after the termination of this Lease or any extension thereof shall be considered as a month to month holdover unless Landlord elects, by written notice to Tenant, to treat such holdover as a renewal of this Lease for one year, at a rental equal to the then-current market rental charged by Landlord at the Building, but not less than double the Total Rent payable hereunder during the last year immediately preceding such holdover. The provisions of this Paragraph do not waive Landlord's right of re-entry or any other rights hereunder.

**LANDLORD'S REMEDIES**

16. (a) All rights and remedies of Landlord herein enumerated shall be cumulative, none shall exclude any other right or remedy allowed herein or by law, and if any provision shall be invalid or unenforceable, it shall apply only to such provisions and the remainder of this Lease shall continue valid and enforceable.

(b) No waiver of any condition expressed in this Lease shall be implied by any neglect of Landlord to enforce any remedy on account of the violation of such condition, whether or not such violation be continued or repeated subsequently, and no express waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated. No receipt of moneys by Landlord from Tenant after the termination in any way of the term or of Tenant's right of possession hereunder or after the giving of any notice shall reinstate, continue or extend the term or affect any notice given to Tenant prior to the receipt of such moneys. After the service of notice or the commencement of a suit or after final judgment for possession of the Premises, Landlord may receive and collect any moneys due, and the payment of said moneys shall not waive or affect said notice, suit or judgment.

8

(c) If (i) default shall be made in the payment of Total Rent or any monthly installment thereof or in the payment of any other sum required to be paid by Tenant under this Lease, and such default shall continue for three (3) days after written notice to Tenant, or (ii) default shall be made in the full performance of any of the other covenants or conditions which Tenant is required to observe and perform under this Lease and such performance is not accomplished, or Tenant has not promptly instituted and is not vigorously pursuing such remedies as in Landlord's judgment are necessary to rectify such default, within ten (10) days after written notice to Tenant, or (iii) the interest of Tenant in this Lease shall be levied on under execution or other legal process, or if any petition shall be filed by or against Tenant to declare Tenant a bankrupt or to delay, reduce or modify Tenant's debts or obligations, or if any petition shall be filed or other action taken to reorganize or modify Tenant's capital structure, if Tenant be a corporation or other entity, or if Tenant be declared insolvent according to law or if any assignment of Tenant's property shall be made for the benefit of creditors, or if a receiver or trustee is appointed for Tenant or his property or (iv) Tenant shall abandon or vacate the Premises during the term of this Lease, then Landlord may treat the occurrence of any one or more of the foregoing events as a default under this Lease, and thereupon at its option may, without notice or demand of any kind to Tenant or any other person, have any one or more of the following described remedies in addition to all other rights and remedies provided at law or in equity:

A. Landlord may terminate this Lease and the term created hereby, in which event Landlord may repossess the Premises and be entitled to recover as liquidated damages a sum of money equal to the present value of the Total Rent required to be paid by Tenant under this Lease for the balance of the stated term of the Lease, less the fair market rental value of the Premises (discounted to then present worth) for said period, plus any other sum of money and damages owed by Tenant to Landlord.

B. Landlord may terminate Tenant's right of possession and may repossess the Premises by forcible entry or detainer suit or otherwise, without demand or notice of any kind to Tenant and without terminating this Lease, in which event Landlord may, but shall be under no obligation so to do, relet all or any part of the Premises for the account of Tenant, for such rent and upon such terms as shall be satisfactory to Landlord (including the right to relet the Premises for a term greater or lesser than that remaining under the term of this Lease and the right to relet the Premises as a part of a larger area and the right to change the character or use made of the Premises). For the purpose of such reletting, Landlord is authorized to decorate or to make any repairs, changes, alterations or additions in or to the Premises that may be necessary or convenient, and if Landlord shall fail or refuse to relet the Premises or if the Premises are relet and a sufficient sum shall not be realized from such reletting after paying all of the costs and expenses of such decorations, repairs, changes, alterations and additions and the expenses of such reletting and of the collection of the rent accruing therefrom to satisfy the Total Rent provided for in this Lease to be paid, then Tenant shall pay to Landlord as damages a sum equal to the amount of the Total Rent reserved in this Lease for such period or periods, or, if the Premises have been relet, Tenant shall satisfy and pay any such deficiency upon demand therefor from time to time, and Tenant agrees that Landlord may file suit to recover any sums falling due under the terms of this Paragraph and any other sums due under this Lease from time to time and that no suit or recovery of any portion due Landlord hereunder shall be any defense to any subsequent action brought for any amount not theretofore reduced to judgment in favor of Landlord.

(d) Upon any termination of this Lease, whether by lapse of time or otherwise, or upon any termination of Tenant's right to possession without termination of the Lease, Tenant shall surrender possession and vacate the Premises and deliver possession thereof to the Landlord, and Tenant hereby grants to Landlord full and free license to enter into and upon the Premises in such event with or without process of law, and to repossess Landlord of the Premises and to expel or remove Tenant and any others who may be occupying or be within the Premises and to remove any and all property therefrom using such force as may be necessary, without being deemed in any manner guilty of trespass, eviction or forcible entry or detainer, and without relinquishing Landlord's rights to rent or any other right given to Landlord hereunder or by operation of law.

(e) Any and all property which may be removed from the Premises by Landlord pursuant to the authority of this Lease or of law, to which Tenant is or may be entitled may be handled, removed and stored by Landlord at the risk, cost and expense of Tenant. Tenant shall pay to Landlord, upon demand, any and all reasonable expenses incurred in such removal and all reasonable storage charges against such property so long as the same shall be in Landlord's possession or under Landlord's control. Any such property of Tenant not removed from the Premises or retaken from storage by Tenant within thirty (30) days after the end of the term, however terminated, or any extension thereof, shall be conclusively deemed to have been forever abandoned by the Tenant.

9

(f) Landlord shall be entitled to all reasonable costs, charges, expenses, and attorneys' fees incurred by Landlord in connection with enforcing any of its rights or remedies under this Lease. In no event shall Landlord be liable to Tenant for any reason whatsoever if Tenant has defaulted under the terms of this Lease.

**USE OF PREMISES**

17. Tenant shall occupy and use the Premises only for the purposes described in the Schedule in accordance with the rules and regulations as provided in Paragraph 13. Tenant will not make or permit any use of the Premises which in any way is forbidden by public law, ordinance or governmental rule or regulation or which may be dangerous to life, person or property, or which may invalidate or increase the premium cost of any policy for insurance carried on the Building by Landlord or Tenant. Violations of any covenants in this Paragraph 17 may be restrained by injunction. In addition to the foregoing:

(a) Tenant shall not advertise the business, profession or activities of Tenant conducted in the Building in any manner which violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining to such business, profession or activities, and shall not use the name of the Building for any purpose other than that of business address of Tenant, and shall never use any picture or likeness of the Building in any circulars, notices, advertisements or correspondence without Landlord's express consent in writing.

(b) Tenant shall not obstruct, or use for storage, or for any purpose other than ingress and egress, the sidewalks, entrances, passages, courts, corridors, vestibules, halls, elevators or stairways of the Building.

(c) No bicycle or other vehicle and no dog or other animal or bird shall be brought or permitted to be in the Building or any part thereof.

(d) No noise, odor or litter, whether caused by Tenant, Tenant's customers, clients, invitees or guests, which is objectionable to Landlord or other occupants of the Building shall emanate from the Premises. Tenant shall not: (i) create or maintain a nuisance on the Premises, or (ii) disturb, solicit or canvass any occupant of the Building, or (iii) do any act tending to injure the reputation of the Building.

(e) Tenant shall not install any musical instrument or equipment in the Building, or any antennas, aerial wires or other equipment inside or outside the Building, without, in each and every instance, obtaining prior approval in writing by Landlord. The use thereof, if permitted, shall be subject to control by Landlord to the end that others shall not be disturbed or annoyed.

(f) Tenant shall not regulate any thermostat, nor waste water by tying, wedging or otherwise fastening open any faucet.

(g) No additional locks or similar devices shall be attached to any door. No keys for any door other than those provided by Landlord shall be made. If more than two keys for one lock are desired by Tenant, Landlord may provide the same upon payment by Tenant. Upon termination of this Lease or of Tenant's possession, Tenant shall surrender all keys to the Premises and shall make known to Landlord the explanation of all combination locks on safes, cabinets and vaults.

(h) Tenant assumes full responsibility for: (i) protecting the premises from theft, robbery and pilferage, (ii) keeping the premises secure, and (iii) locking the doors in and to the Premises. Any damage or loss resulting from the failure of Tenant to perform the foregoing covenants shall be paid for by Tenant. All property belonging to Tenant, or any person in the Premises, which is in the Building or the Premises, shall be there at the risk of Tenant or other person only, and Landlord, its partners and their respective agents and employees shall not be liable for damage thereto or theft or misappropriation thereof. Tenant shall indemnify and hold Landlord, its partners and their respective agents and employees harmless from any claims arising out of same, including subrogation claims by Tenant's insurance carrier.

(i) If Tenant requests telegraphic, telephonic, burglar alarm or signal service and Landlord is willing to grant such request, Landlord will direct where and how connections and all wiring for such service shall be introduced and run. Without such permission of Landlord and directions, no boring, cutting or installation of wires or cables is permitted.

(j) Shades, draperies or other form of inside window covering must be of such shape, color and material as approved by Landlord.

(k) Tenant shall not overload any floor. Safes, furniture and all large articles shall be brought through the Building and into the Premises at such times and in such manner as Landlord shall direct and at Tenant's sole risk and responsibility. Tenant shall list all furniture, equipment and similar articles to be removed from the Building, and the list must be approved at the Office of the Building or by a designated person before Building employees will permit any article to be removed.

(1) Unless Landlord gives advance written consent in each and every instance, Tenant shall not install or operate any steam or internal combustion engine, boiler, machinery, refrigerating or heating device or air-conditioning apparatus in or about the Premises, or carry on any mechanical business therein, or use the Premises for housing accommodations or lodging or sleeping purposes, or do any cooking therein or install or permit the installation of any vending machines, or use any illumination other than electric light, or use or permit to be brought into the Building any inflammable oils or fluids such as gasoline, kerosene, naphtha and benzene, or any explosive or other articles hazardous to persons or property.

(m) Tenant shall not place or allow anything to be against or near the glass of partitions or doors of the Premises which may diminish the light in, or be unsightly from, public halls or corridors.

(n) Tenant shall not install in the Premises any equipment which uses a substantial amount of electricity without the advance written consent of Landlord. Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electric wiring in the Building and the Premises and the needs of other tenants in the Building and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

(o) Tenant may not install carpet padding or carpet by means of a mastic, glue or cement. Such installation shall be by tackless strip or double-faced tape only. Tenant shall not do any painting or decorating in the Premises without the Landlord's prior written consent, and in no event shall Tenant apply any paint, varnish, stain or other similar material to the doors, door or window trim, baseboards, or other trim in the Premises.

(p) Tenant shall not conduct any auction, fire or "going out of business," or bankruptcy sales in or from the demised Premises.

(q) Tenant shall lower and adjust the venetian blinds on the windows in the Premises if such lowering and adjustment reduces the sun load.

(r) Tenant shall not sell or offer for sale any goods, equipment, fixtures or any other item except in connection with the use of the Premises stated in the Schedule.

(s) Tenant shall not place or permit to be placed any article of any kind on the outside window ledges or elsewhere on the exterior walls, and shall not throw or drop any article from any window of the building.

(t) Tenant shall not serve, nor permit the serving, of alcoholic beverages in the Premises unless Tenant shall have procured Host Liquor Liability Insurance, issued by companies and in amounts reasonably satisfactory to Landlord, naming Landlord as an additional party insured.

(u) Tenant shall not paint, display, inscribe, maintain or affix any sign, placard, picture, advertisement, name, notice, lettering or direction on any part of the outside or inside of the Building, or on any part of the inside of the Premises which can be seen from the outside of the Premises, without the written consent of Landlord, and then only such name or names or matter and in such color, size, style, character and material as may be first approved by Landlord in writing. Landlord reserves the right to remove at Tenant's expense all matter other than that above provided for without notice to Tenant.

**ASSIGNMENT AND SUBLETTING**

18. (a) Tenant shall not, without the prior written consent of Landlord (i) assign this Lease or any interest hereunder; (ii) permit any assignment or transfer of this Lease by operation of law; (iii) sublet the Premises or any part thereof; or (iv) permit the use of the Premises by any parties other than Tenant, its agents and employees. For purposes of the foregoing sentence, "assignment" and "transfer" shall be deemed to include any merger, stock purchase or sale, sale of assets or other corporate transfer or reorganization of any kind or nature whatsoever whether by operation of law or otherwise, or if at any time during the term hereof, the person or persons who own a majority of Tenant's voting shares at the time of the execution of this Lease, cease to own a majority of such shares. Tenant shall, by notice in writing, advise Landlord of its intention from, on and after a stated date (which shall not be less than thirty (30) days after date of Tenant's notice), to assign or transfer this Lease or to sublet any part or all of the Premises for the balance or any part of the term. Tenant's notice shall include all of the terms of the proposed assignment, transfer or sublease and shall state the consideration therefor. In such event,

11

Landlord shall have the right, to be exercised by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice, to recapture the space described in Tenant's notice and such recapture notice shall, if given, cancel and terminate this Lease with respect to the space therein described as of the date stated in Tenant's notice. Tenant's notice shall state the name and address of the proposed assignee, transferee or subtenant and a true and complete copy of the proposed assignment or sublease shall be delivered to Landlord with Tenant's notice. If Tenant's notice shall cover all of the Premises, and Landlord shall have exercised its foregoing recapture right, the term of this Lease shall expire and end on the date stated in Tenant's notice as fully and completely as if that date had been herein definitely fixed for the expiration of the term. If, however, this Lease be cancelled with respect to less than the entire Premises, Total Rent reserved herein shall be adjusted on the basis of the number of square feet retained by Tenant in proportion to the number of square feet contained in the Premises, as described in this Lease, and this Lease as so amended shall continue thereafter in full force and effect.

(b) If Landlord, upon receiving Tenant's notice with respect to any such space, shall not exercise its right to recapture as aforesaid, Landlord will not unreasonably withhold its consent to Tenant's assignment or transfer of this Lease or subletting such space to the party identified in Tenant's notice, provided, however, that in the event Landlord consents to any such assignment or subletting, and as a condition thereto, Tenant shall pay to Landlord seventy-five per cent (75%) of all profit derived by Tenant from such assignment or subletting, provided, however, that if Landlord agrees to release Tenant from its duties and obligations under this Lease pursuant to such assignment or subletting, Tenant shall pay to Landlord one hundred per cent (100%) of all profits derived by Tenant from such assignment or subletting. For purposes of the foregoing, "profit" shall be deemed to include, but shall not be limited to, the amount of all rent payable by such assignee or sublessee in excess of the Total Rent payable by Tenant under this Lease. If a part of the consideration for such assignment or subletting shall be payable other than in cash, the payment to Landlord of its share of such non-cash consideration shall be in such form as is satisfactory to Landlord.

(c) Consent by the Landlord to any of the actions specified in subparagraph (a) of this Paragraph shall not operate to relieve Tenant from any covenant or obligation under this Lease except to the extent, if any, provided for in such consent, or be deemed to be a consent to or relieve Tenant from obtaining Landlord's consent to any subsequent action specified in subparagraph (a) of this Paragraph.

**NOTICES**    19. All notices to be given by one party to the other party under this Lease shall be given in writing, mailed or delivered as follows:

(a) To the Landlord at the office of the Building or to such other person at such other address designated by notice sent to Tenant and after commencement of the term at the address to which rent is payable.

(b) To the Tenant at the place set forth in the Schedule until Tenant takes possession of the Premises, and thereafter at the Premises or at such other address designated by notice to the Landlord.

Mailed notices shall be sent by United States Certified or Registered Mail, postage prepaid, return receipt requested. Such notice shall be deemed to have been given upon posting in the United States mail.

**QUIET ENJOYMENT**    20. So long as Tenant shall observe and perform the covenants and agreements binding on it hereunder, Tenant shall at all times during the term herein granted peacefully and quietly have and enjoy the possession of the Premises without any encumbrance or hindrance by, from or through Landlord, its successors or assigns.

**DEFAULT UNDER OTHER LEASE**    21. If any lease made by Tenant for other Premises in the Building shall be terminated or terminable after the making of this Lease by reason of the default of Tenant thereunder, Landlord may, in its sole discretion, terminate this Lease by notice to Tenant, or exercise any of the remedies set forth in Paragraph 16 hereof.

**INDEMNITY**    22. Tenant shall indemnify and save Landlord harmless from and against any liability or expense, including reasonable attorneys' fees, arising from the use and occupation of the Premises or the Building by Tenant, or anyone on the Premises or in the Building with Tenant's permission, or from any breach of this Lease.

**NONLIABILITY OF LANDLORD**    23. Tenant hereby acknowledges that Landlord is a partnership, and expressly agrees that any liability or obligation of said partnership under this Lease shall be limited to its partnership assets and no partner of said partnership shall be individually or personally liable for any claim arising out of this Lease. A deficit capital account of any such partner shall not be deemed an asset of said partnership.

12

**EMINENT DOMAIN**      24. If the Building, the land underlying the Building, Landlord's interest as lessee under the lease referred to in Paragraph 7, or a substantial part of the Premises, shall be lawfully taken or condemned for any public or quasi-public use or purpose, the term of this Lease shall end upon, and not before, the date of the taking of possession by the condemning authority, and without apportionment of the award. Tenant hereby assigns to Landlord Tenant's interest in such award, if any. The Total Rent shall be apportioned as of the date of such termination. If any part of the Building, other than the Premises, or less than a substantial part of the Premises shall be taken or condemned, which taking materially interferes with Landlord's operation of the Building, or if the grade of any street or alley adjacent to the Building is changed by any competent authority and such taking or change of grade makes it necessary or desirable to substantially remodel or restore the Building, Landlord shall have the right to cancel this Lease upon not less than ninety (90) days notice prior to the date of cancellation designated in the notice. No money or other consideration shall be payable by Landlord to Tenant for the right of cancellation, and Tenant shall have no right to share in the condemnation award (or in any judgment for damages caused by the change of grade). In the event Landlord does not cancel the Lease as aforesaid, Landlord shall rebuild the Building or the Premises, as the case may be, and in the event a portion of the Premises is taken or condemned, Total Rent shall abate on a proportionate basis from the date of such taking or condemnation.

**MISCELLANEOUS**      25. (a) Each provision hereof shall extend to and shall, as the case may require, bind and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and assigns.

. (b) All amounts owed to the Landlord hereunder shall bear interest at the rate of two per cent (2%) per annum in excess of the prime rate then charged by The First National Bank of Chicago on unsecured loans to its most creditworthy customers from the date due until paid. If such rate shall be deemed usurious by any court of competent jurisdiction, all amounts owed to Landlord hereunder shall bear interest at the highest rate permitted by applicable law from the date due until paid.

(c) Tenant shall deliver to Landlord or to its mortgagee, auditors, or prospective purchaser when requested by Landlord a certificate to the effect that this Lease is in full force and effect and that Landlord is not in default thereunder, or stating specifically any exceptions thereto. Failure to give such a certificate within two (2) weeks after written request shall be conclusive evidence that this Lease is in full force and effect and Landlord is not in default and Tenant shall be estopped from asserting any defaults known to it at that time.

· (d) Landlord shall have the right to terminate this Lease at any time if Landlord proposes or is required, for any reason, to remodel, remove or demolish the Building or any substantial portion of it, or if the Landlord decides to sell the Building or if in the aggregate sixty-six and two-thirds per cent (66 ⅔%) or more of the partnership interests in the partnership identified herein as Landlord are hereafter sold or if the Landlord decides to convey the ground leasehold identified in Paragraph 7 or to lease to one tenant for a term of ten years or more either substantially all the Building or substantially all the Building except the ground floor. Such termination shall become effective and conclusive by notice of the Landlord to the Tenant, which notice shall be given not less than six (6) months prior to the termination date fixed in the notice. No money or other consideration shall be payable by the Landlord to the Tenant for this right and the right hereby reserved to the Landlord shall inure to all purchasers, assignees, lessees and transferees, as the case may be and is in addition to all other rights of the Landlord.

(e) If the Building shall be sold or leased or if Landlord's interest as lessee under the ground lease identified in Paragraph 7 shall be sold, Landlord shall be relieved of all obligations hereunder, and unless this Lease is terminated as provided in subparagraph (d) above the purchaser or lessee of the entire Building shall be deemed to have agreed to perform all obligations of Landlord hereunder.

(f) Submission of this document for examination or for execution by Tenant does not constitute an offer by Landlord to lease the Premises. This Lease shall only become effective as to Landlord when it is duly executed on Landlord's behalf by an Executive Vice President or Senior Vice President of Helmsley-Spear of Illinois, Inc., Landlord's agent, as no other person has the power or authority to bind Landlord.

(g) This Lease shall be governed by and construed under the laws of Illinois.

(h) If the Landlord shall be unable to give possession of the Premises on the date of the commencement of the term by reason of any of the following: (i) Landlord has not completed its preparation of the Premises, (ii) the holding over or retention of possession of any tenant, tenants or occupants, or (iii) for any other reason, Landlord shall not be subject to any liability for failure to give possession. Under such circumstances the rent reserved and covenanted to be paid herein shall not

13

commence until the Premises are available for occupancy, and no such failure to give possession on the date of commencement of the term shall affect the validity of this Lease or the obligations of the Tenant hereunder, nor shall the same be construed to extend the term. The Premises shall not be deemed to be unready for Tenant's occupancy or incomplete if only minor or insubstantial details of construction, decoration or mechanical adjustments remain to be done in the Premises or any part thereof.

(i) Landlord may authorize Tenant to take possession of all or any part of the Premises prior to the beginning of the term. If Tenant does take possession pursuant to authority so given, all of the covenants and conditions of this Lease shall apply to and shall control such pre-term occupancy. Base Annual Rent for such pre-term occupancy shall be paid at the monthly rate set forth in the Schedule. If the Premises are occupied for a fractional month, Total Rent shall be prorated on a per diem basis. If part of the Premises is occupied, Total Rent shall be prorated on the basis of the area occupied.

(j) The headings of Paragraphs are for convenience only and do not limit, expand or construe the contents of the Paragraphs.

(k) The Landlord's title is and always shall be paramount to the title of Tenant and nothing in this Lease contained shall empower Tenant to do any act which can, shall or may encumber the title of Landlord.

(l) Time is of the essence of this Lease and of each and all provisions thereof.

(m) There are no agreements between Landlord and Tenant except as set forth herein, and no amendment of any of the terms of this Lease shall be effective unless made in writing and signed by the parties hereto. The invalidity of any portion or clause of this Lease shall not affect the remainder hereof, but the same shall continue in full force and effect.

**IN WITNESS WHEREOF,** the parties hereto have set their hand and seal the day and year first above written.

LANDLORD:

**CHICAGO EXCHANGE BUILDING ASSOCIATES**

By Helmsley-Spear of Illinois, Inc.,
as agent

By _____

TENANT:    Hinkle Engineering

By _____

14

Civil Cover Sheet

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

## Civil Cover Sheet

**FILED**

JUN 2 9 2001

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

01C5078

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

---

**Plaintiff(s): HINKLE ENGINEERING, INC.**

**Defendant(s): 175 JACKSON L.L.C. INTELL MANAGEMENT AND INVESTMENT COMPANY WALSH CONSTRUCTION COMPANY OF ILLINOIS**

County of Residence: Oklahoma County

Plaintiff's Atty: Jay R. Hoffman
Suite 802
19 S. LaSalle St., Chicago, IL
60603
(312) 899-0899

County of Residence:

Defendant's Atty:

*Katz*

**DOCKETED**

JUN 2 9 2001

---

II. Basis of Jurisdiction: **4. Diversity (complete item III)**

**JUDGE KOCORAS**

III. Citizenship of Principle
Parties **(Diversity Cases Only)**

Plaintiff:-**2 Citizen of Another State**
Defendant:-**1 Citizen of This State**

**MAGISTRATE JUDGE BOBRICK**

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **380 Other Pers Property Damage**

VI.Cause of Action: **DIVERSITY ACTION UNDER 28 USC 1332(a)(2) FOR BREACH OF CONTRACT AND NEGLIGENCE ARISING OUT OF FLOODING DAMAGE IN LEASED BUSINESS PREMISES**

VII. Requested in Complaint
Class Action: **No**
Dollar Demand: **over $75,000**
Jury Demand: **Yes**

VIII. This case **Is NOT** a refiling of a previously dismissed case. (If yes case number ___ by Judge ___)

---

Signature:

Date: 6/29/01

6/29/01

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

Eastern Division

In the Matter of

HINKLE ENGINEERING, INC.,
V.
175 JACKSON L.L.C., INTELL MANAGEMENT AND
INVESTMENT COMPANY, and WALSH
CONSTRUCTION COMPANY OF ILLINOIS

**FILED**

JUN 29 2001

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Case Number: 01 C 5078

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

HINKLE ENGINEERING, INC.

**DOCKETED**
JUN 29 2001

| (A) | (B) |
|---|---|
| SIGNATURE *Jay R. Hoffman* | SIGNATURE **JUDGE KOCORAS** |
| NAME Jay R. Hoffman | NAME |
| FIRM | FIRM **MAGISTRATE JUDGE BOBRICK** |
| STREET ADDRESS 19 South LaSalle Street, Suite 802 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60603 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 899-0899 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6193213 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES NO |
| | DESIGNATED AS LOCAL COUNSEL? YES NO |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES NO | TRIAL ATTORNEY? YES NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO | DESIGNATED AS LOCAL COUNSEL? YES NO |